# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| JUSTIN N. WOOTEN, ) | |
| ALICIA L. WOOTEN, ) | |
| ) | Case No. 08-72923-SCS |
| *Debtors.* ) | |
| ) | |
| ) | |
| OCEAN EQUITY GROUP, INC., ) | |
| ) | APN 09-07024-SCS |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| JUSTIN N. WOOTEN, ) | |
| ) | Chapter 7 |
| *Defendant.* ) | |
| ) | |

## MEMORANDUM OPINION

This matter came on for trial on the complaint of Ocean Equity Group, Inc. ("Ocean Equity")

to determine the dischargeability of a certain debt owed to Ocean Equity by the debtor, Justin N.

Wooten ("Wooten"), pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6). Evidence

was taken on October 14, 2009. Among the exhibits introduced by Ocean Equity was the transcript

of a deposition of Wooten taken earlier pursuant to Federal Rule of Bankruptcy Procedure 2004,

which the Court did not review prior to trial.[1] The parties presented their final arguments on

November 17, 2009, at which time the Court took the matter under advisement. The Court has

---

[1] Wooten, by counsel, initially objected to the admission of the deposition transcript into evidence. *See* Docket Entry 21. Due to the pendency of the objection, the Court did not review the deposition transcript prior to trial. The objection was withdrawn at trial. *See* Trial Transcript dated Oct. 14, 2009, at 3 (hereinafter Tr.).

jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments

presented by counsel and the pleadings submitted, the Court makes the following findings of fact

and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. FINDINGS OF FACT

Wooten filed his petition for relief pursuant to Chapter 7 of the United States Bankruptcy

Code in this Court on August 31, 2008. On March 3, 2009, Ocean Equity filed a complaint to

determine the dischargeability of a certain debt owed to it by Wooten ("Complaint"). The

Complaint alleges that Ocean Equity is an asset-purchasing entity that buys future Visa and

MasterCard credit card receivables from other businesses. Compl. ¶ 6. According to the Complaint,

Wooten's Auto Service is a Virginia corporation whose principal place of business was located at

6004 Indian River Road, Virginia Beach, Virginia 23464. *Id*. ¶ 7. Wooten is President and majority

shareholder in Wooten's Auto Service. *Id*. ¶ 8. Wooten submitted a Funding Application

("Application")[2] that he executed, which listed that Wooten's Auto Service received monthly credit

card receipts of $20,000.00 and monthly cash receipts of $10,000.00. *Id*. ¶¶ 9, 10. Based on the

information contained in the Application, Ocean Equity agreed to purchase future credit card

receivables from Wooten's Auto Service, and on or about January 30, 2008, Ocean Equity,

Wooten's Auto Service, and Wooten entered into a Merchant Funding Agreement (the

"Agreement")[3] whereby Ocean Equity was to purchase $72,900.00 in assets, in the form of credit

---

[2] A copy of the Application was attached as Exhibit A to the Complaint. The Application was also admitted at trial as Plaintiff's Exhibit 1.

[3] The Agreement was admitted at trial as Plaintiff's Exhibit 2.

card receivables, from Wooten's Auto Service. *Id.* ¶¶ 11-12. Ocean Equity's purchased assets were to be paid by Ocean Equity receiving 23% of the credit card receipts taken in by Wooten's Auto Service. *Id.* ¶ 12. On or about January 30, 2008, Ocean Equity disbursed funds in the amount of $35,000.00 pursuant to the Agreement. *Id.* ¶ 13. Under the Agreement, Ocean Equity alleges it received a first priority lien, security interest, and assignment in receipts, accounts, instruments, inventory, equipment, general intangibles, chattel paper, cash and cash equivalents, documents, deposit and other accounts, fixtures, personal property, and leases of Wooten's Auto Service. *Id.* ¶ 14. Wooten's Auto Service ceased operating in the middle of September 2008. *Id.* ¶ 15. Ocean Equity further alleges that Wooten testified at an examination conducted pursuant to Federal Rule of Bankruptcy Procedure 2004[4] that he notified his parts suppliers that he was closing his business but did not notify Ocean Equity. *Id.* ¶ 16.

Ocean Equity asserts that it had a lien on all of the personal property of Wooten's Auto Service and that Wooten removed that property from the business location in the middle of the night. *Id.* ¶ 17. Wooten testified at the Rule 2004 examination that he paid $41,000.00 for the business equipment when he opened his business. *Id.* ¶ 18. According to Ocean Equity, Wooten further testified at the Rule 2004 examination that he sold the tire equipment for $6,000.00 and deposited the money into his personal bank account to enable him to make payments on the Deeds of Trust on his home, and that he sold certain flush equipment for $1,000.00 cash, which he used to pay his personal obligations. *Id.* ¶¶ 19-20. Wooten also testified that he sold other pieces of equipment for cash to unknown third parties and disposed of the remaining personal property. *Id.* ¶ 21. According

---

[4] The transcript of the deposition taken pursuant to Rule 2004 was admitted at trial as Plaintiff's Exhibit 9.

to the Complaint, Wooten testified that Wooten's Auto Service took in only $15,000.00 to $18,000.00 monthly in charge card receipts, not the $20,000.00 of monthly receipts as stated in the Application. *Id*. ¶ 22.  Ocean Equity alleges that, had it known that Wooten's Auto Service did not take in $20,000.00 monthly in credit card receipts, it would not have entered into the Agreement with Wooten's Auto Service and Wooten. *Id*. ¶ 23.

Ocean Equity also alleges Wooten testified that monthly sales of Wooten's Auto Service ranged between $26,000.00 and $28,000.00, not the $30,000.00 in monthly sales as stated in the Application, and that the average monthly overhead for the business was $30,000.00. *Id.* ¶¶ 24, 25. Wooten also testified that Wooten's Auto Service did not pay its payroll taxes to the Internal Revenue Service for 2006 and 2007, thereby incurring a liability in excess of $43,000.00 (*id*. ¶ 27), and that he received a Final Notice from the Internal Revenue Service dated December 7, 2007, stating that the Internal Revenue Service intended to levy. *Id*. ¶ 28.  As a result of this, Ocean Equity contends Wooten failed to disclose the business's true financial condition to Ocean Equity. *Id*. ¶ 30.

Ocean Equity additionally asserts that despite the Agreement clearly stating that Wooten's Auto Service would provide Ocean Equity with a lien on all of the inventory, Wooten testified that he transferred or sold the inventory to third parties in spite of the lien. *Id*. ¶¶ 31-32.  Finally, Ocean Equity alleges the balance owed to it is $28,613.43 plus attorney fees, costs, and interest pursuant to the Agreement and the Application. *Id.* ¶ 34.  Based upon these factual allegations, Ocean Equity seeks a determination of the dischargeability of the debt owed to it by Wooten under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6).

Wooten's Answer largely denies the allegations of the Complaint.  Wooten specifically

4

denies that he made any misrepresentations to Ocean Equity and that Ocean Equity had any liens

upon the property of Wooten's Auto Service except for its credit card receipts.  Ans. ¶¶ 30-32, 56.

Wooten also affirmatively asserts that Ocean Equity had full access to the records of Wooten's Auto

Service before entering into the transaction.  *Id.* ¶¶ 9, 11, 22, 24, 30,

Ocean Equity and Wooten stipulated that Wooten was President and the majority shareholder

of Wooten's Auto Service, that he signed the Application, that Ocean Equity and Wooten's Auto

Service entered into the Agreement, and that Ocean Equity advanced $35,000.00 under the terms

of the Agreement.  Stipulations of Fact ¶¶ 2-5.  They also stipulated that Wooten's Auto Service

ceased its business operations in mid-September 2008, that Wooten's Auto Service did not pay its

payroll taxes to the Internal Revenue Service for 2006 and 2007 and incurred a liability in excess

of $43,000.00, and that Wooten received a Final Notice from the Internal Revenue Service dated

December 7, 2007, stating the Internal Revenue Service intended to levy on the assets of Wooten's

Auto Service ("Notice of Intent to Levy").[5]  *Id.* ¶¶ 6-8.  Finally, the parties stipulated that Wooten's

Auto Service owed other taxing authorities money for delinquent taxes as of January 30, 2008, and

that Wooten sold or disposed of all of the assets of Wooten's Auto Service and did not pay any of

the proceeds thereof to Ocean Equity.  *Id.* ¶¶ 9-10.[6]

A.  Evidence at Trial

The sole witnesses at trial were Edward Zinner ("Zinner") and Wooten.  Zinner testified he

is the Chief Executive Officer of Ocean Equity.  Ocean Equity solicited Wooten, met with him, and

---

[5]  The Notice of Intent to Levy was admitted at trial as Plaintiff's Exhibit 7.

[6]  Counsel for Ocean Equity recited the Stipulations of Fact on the record at trial.  *See* Tr. at 4-5.

in addition to signing him up for credit card processing with the Federated Payment Systems, a processor with whom Ocean Equity has an agreement, discussed the possibility of Wooten obtaining working capital for his business. Tr. at 6-7. Wooten provided the information required by the Application, which Ocean Equity requires every prospective client to complete and upon which it relies in determining whether to provide capital to that individual. *Id.* at 8. Wooten advised the monthly credit card receipts of Wooten's Auto Service totaled $20,000.00, which figure was inserted in the Application. *Id.* at 21. Zinner testified he would expect this figure to be accurate within a thousand dollars. *Id.* at 22.

Wooten indicated on the Application his taxes were not current, telling Zinner that "he had a small state tax obligation due that was just a few thousand dollars and that there were—and that everything else at that time was current." *Id.* at 9. Wooten did not advise Zinner that Wooten's Auto Service owed in excess of $43,000.00 to the Internal Revenue Service; according to Zinner, "Had he done that, he would not have qualified for any money at all." *Id*. at 10. Zinner believes that Wooten did not honestly answer the question in the Application as to whether there were any pending lawsuits against Wooten or Wooten's Auto Service, as Zinner believes that a Notice of Intent to Levy, which had been received by Wooten prior to completion of the Application, indicates a lawsuit is pending. *Id.* at 28-29. Zinner also believes that the Notice of Intent to Levy indicates that Wooten did not answer honestly when he represented he did not have any tax liens. *Id*. at 30-31.[7]

---

[7] Zinner appeared to concede the Notice of Intent to Levy was not an actual tax lien but then reasserted his contention that it was in fact a lien:

Q.   So you say—isn't it correct a notice of intent to levy is not a federal tax lien?

As due diligence prior to purchasing credit card receivables, Zinner testified that he examines prior credit card statements in addition to requesting a credit report and a Dun & Bradstreet report and performing a search for Uniform Commercial Code financing statements. Zinner also stated that he inquires with the applicant's references. *Id.* at 11-13.

Ocean Equity, as a condition of its advance of monies, required the execution of the Agreement that, among other conditions, pledged "[g]enerally all of the assets of the business and any bank accounts, anything of value that is owned by the business" as collateral. *Id.* at 10. Zinner was certain as to Wooten's awareness that Ocean Equity was taking a lien on all the assets of Wooten's Auto Service:

> Q.   Did you discuss this provision with Mr. Wooten?
>
> A.   Yes, I did.
>
> Q.   He was fully aware that you were—that Ocean Equity was taking a lien on all the assets?
>
> A.   I absolutely discussed and disclosed that to him and—as a matter of fact, prior to funding this, because he had had a cash advance with another company. There was a UCC lien that they would file. Everybody that does what we do files one, so we absolutely had that discussion.

---

> A.   A notice of intent to levy is the step prior to it becoming a tax lien.
>
> Q.   So at that point isn't it correct that is not a tax lien?
>
> A.   You can mince words, but to me it's a tax lien. It's an imminent tax lien.
>
> Q.   But as of that day isn't it correct—
>
> A.   There was a notice of a lien. To me it's a lien.

Tr. at 30.

7

*Id.* at 11.  Zinner confirmed that, at the time the transaction documents were signed, he and Wooten did not read through the entire agreement together but that Wooten had the opportunity to do so and to ask questions about it.  *Id.* at 34.

Ocean Equity advanced $35,000.00 to Wooten's Auto Service.  An additional $15,000.00 was not advanced at the initial funding stage because Wooten's Auto Service did not qualify for the additional funds at that time.  *Id.* at 13-14.  According to Zinner, Wooten did not notify Ocean Equity regarding the closure of Wooten's Auto Service.  *Id.* at 15-16.  Zinner believes the balance owed by Wooten and Wooten's Auto Service to Ocean Equity was $28,613.43 as of October 31, 2008.  Ocean Equity included in its claimed balance due a fee of $6,870.00 for the cessation of the relationship between Wooten's Auto Service and the credit card processing company Wooten had earlier agreed to use.  Upon questioning by the Court, Zinner admitted that the fee is not provided for in any of the documents signed by Wooten and that Wooten in fact never changed credit card processing companies.  *Id.* at 36-38.  Ocean Equity received $29,283.18 in monies from Wooten's Auto Service during the duration of their financing arrangement.  *Id.* at 26.[8]  Prior to the date of trial, Ocean Equity had incurred attorney fees in the amount of $8,500.00.  *Id.* at 17-18.

Wooten testified as to his experience as a mechanic and as a manager in the automotive service industry prior to starting Wooten's Auto Service.  *Id.* at 40-41.  Wooten arrived at the amount of credit card and cash receivables represented in the Application by reviewing his profit and loss statements and averaging the monthly amounts, which he admits were an estimate but states the amounts were "fairly accurate" and within $1,000.00 of the actual figures.  *Id.* at 46.  According

---

[8]  Admitted as Plaintiff's Exhibit 4 at trial was the payment history, which sets forth all payments received by Ocean Equity.  According to this exhibit, it appears the correct total amount received by Ocean Equity was $29,286.57.

to Wooten, no tax liens existed at the time the Application was completed; he stated that his

accountant was "in negotiation" with the taxing authorities regarding back taxes. *Id*. at 46-47.

Wooten testified he believed he only gave Ocean Equity his credit card receipts as collateral

for the funds:

> Q.    [T]ell this Court your discussions relating to any security interest, collateral, or anything like that.
>
> A.    It was my understanding that what was being secured was my future credit card—my future credit card payments or my income per the credit cards.
>
> Q.    Did you believe then or now or at any time you were giving them any security interest in any of the equipment at the store?
>
> A.    No, sir.

*Id*. at 44.  Wooten further testified that he did not believe Ocean Equity had a security interest in

anything other than his credit card receipts "because anytime I've had a secured loan there was

notation taken of what was actually secured as collateral." *Id*. at 48.  Had Wooten known Ocean

Equity had a lien on the equipment of Wooten's Auto Service, he "would have called them up and

said come get it and the keys are on the counter and then I could have walked away." *Id*. at 49.

Wooten believes Wooten's Auto Service failed because of the economy. *Id.* at 45.  Wooten

admitted he did not contact any of his company's creditors when the company ceased operations.

*Id*. at 48.

### B.  The Deposition of Wooten

Ocean Equity also introduced the transcript of the deposition of Wooten taken on January

23, 2009, by Ocean Equity pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Wooten

Deposition").  The relevant portions of the Wooten Deposition are as follows:

1.    Wooten and his father contributed approximately $165,000.00 in capital to Wooten's Auto

9

Service.  Wooten Deposition, at 13, lines 12-19; 19, lines 6-16.

2.      The average total credit card sales for Wooten's Auto Service in 2007 was $15,000.00 to
$18,000.00 per month, and cash receipts each month averaged $12,000.00 to $15,000.00,
"sometimes higher, sometimes lower." *Id*. at 41, lines 9-20.

3.      The overhead each month at Wooten's Auto Service was about $30,000.00. *Id*. at 27, lines
20-25.

4.      Wooten signed and initialed each page of the Agreement. *Id*. at 44, lines 20-25; 45, lines 1-
9.

5.      Wooten did not review the Agreement before he signed it but "thumbed through it and
glanced it over," believing it to be like one he had previously signed with First Funds, to
which he sold his credit card futures in an unsecured transaction. *Id*. at 45, lines 10-16; 46,
lines 13-17.  Wooten does not believe Ocean Equity had a lien on any assets of Wooten's
Auto Service except for future credit card receipts. *Id*. at 47, lines 7-12.  Wooten did not
read the portion of the Agreement that stated Ocean Equity would have a lien on the fixtures
and personal property of Wooten's Auto Service. *Id*. at 47, lines 18-25; 48, lines 1-4.

6.      Payments from Wooten's Auto Service to Ocean Equity averaged $4,000.00 or more each
month. *Id*. at 24, lines 19-21.

7.      The average total cash receipts per month in 2008 was $12,000.00 to $15,000.00,
"sometimes higher, sometimes lower." *Id*. at 41, lines 24-25; 42, lines 1-5.

8.      The average total monthly credit card sales for Wooten's Auto Service in 2008 was
$15,000.00 to $18,000.00, "sometimes higher." *Id*. at 41, lines 21-23.

9.      In 2008, Wooten's Auto Service was breaking even, grossing approximately $30,000.00 per

10

month.  *Id*. at 42, lines 6-11.

10.    Wooten's Auto Service began experiencing financial difficulties in August 2008 because of

the economy.  The decline in sales was very rapid.  *Id.* at 19, lines 17-25; at 20, lines 1-4.

11.    Sales for Wooten's Auto Service in July 2008 averaged $1,200.00 to $1,500.00 per day but

dropped to $200.00 to $800.00 per day in August 2008.  *Id*. at 20, lines 5-12.

12.    The last communication Wooten had with Ocean Equity was in August or September 2008

when he finally learned Wooten's Auto Service would not receive the additional $15,000.00

in funding from Ocean Equity.  *Id.* at 25, lines 12-25; at 26, lines 1-9.

13.    Wooten's Auto Service ceased its business operations in mid-September 2008 and had

completely vacated its business premises by October 1, 2008.  *Id.* at 16, lines 9-25.

14.    Wooten probably never advised Ocean Equity of the closure of Wooten's Auto Service.  *Id.*

at 26, lines 22-24; at 27, lines 1-19.  *But see id.* at 24, lines 9-12 (stating he believed he

informed Ocean Equity of the business's closure but "couldn't say for 100 percent.").

15.    Wooten sold some of the equipment at Wooten's Auto Service before the closure of the

business to generate capital.  *Id*. at 31, lines 18-23.

16.    There was equipment remaining at the business premises of Wooten's Auto Service at the

time of the business's closure.  *Id*. at 28, lines 12-19.

17.    Wooten sold the equipment remaining at closure to various third parties.  *Id*. at 31-38.

18.    The monies received by Wooten from the liquidation of the equipment of Wooten's Auto

Service totaled $10,950.00.  *Id.* at 32-38.[9]

---

[9]  The specifics of the liquidation of the equipment of Wooten's Auto Service by Wooten
were as follows:

19.     The inventory remaining at Wooten's Auto Service at the time of its closure was returned to the company from which it was purchased by the end of September 2008.  *Id*. at 38, lines 13-21.

20.     The sole receivable owed to Wooten's Auto Service at the time of its closure was in the amount of $900.00 and was never paid.  *Id*. at 38, lines 22-25; at 39, lines 1-6.

## II. CONCLUSIONS OF LAW

A.  11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation, or Actual Fraud

Ocean Equity believes the indebtedness owed to it by Wooten should not be discharged pursuant to 11 U.S.C. § 523(a)(2)(A) because Wooten knew or should have known Wooten's Auto Service lacked the abilty to repay the monies owed to Ocean Equity.  Ocean Equity's specific allegations in this regard are contained in paragraphs 36 through 45 of the Complaint:

36.     The Debtor testified that the business' [*sic*] monthly gross income was less than the monthly overhead of $30,000.00.

37.     The business did not have sufficient income to pay Ocean Equity.

---

1. Tire Equipment: sold to an unidentified person for $6,000.00.  Wooten Deposition, at 32.
2. Flush Equipment: sold to an individual named Matt for $1,000.00.  *Id.* at 32-33.
3. Lift: sold to Wooten's Auto Service landlord for $1,500.00.  *Id*. at 34.
4. Strut Compressor: sold to an unidentified person for $150.00.  *Id.* at 36-37.
5. Air Compressor: sold to landlord for $800.00.  *Id.* at 35-37.
6. Air Conditioning Machine: sold to an unidentified person for $1,000.00.  *Id.* at 37-38.
7. Diagnostic Machine: sold to an unidentified person for $500.00.  *Id.* at 38.

TOTAL                              $10,950.00

Wooten also testified that other assets, such as the office equipment and the bench grinder, were disposed of because they were without value, and some assets such as parts inventory were returned to the entity from whom they had been purchased.  No inventory remained at the time of closure, and only one receivable existed, which was uncollectible.  Wooten testified he remained in possession of one computer and two filing cabinets.  *Id*. at 34, 37-39.

38.    Ocean Equity asserts that the Debtor did not intend to honor its [*sic*] obligation to satisfy the obligation.

39.    The Debtor obtained the funds through representations which he either knew to be false or were made with such reckless disregard for the truth as to constitute willful misrepresentations.

40.    The Debtor made the misrepresentations with the intention and purpose of deceiving Ocean Equity so that Ocean Equity would purchase the future receivable.

41.    Ocean Equity justifiably relied on Debtor's false representations.

42.    As a proximate result of Debtor's misrepresentations, Ocean Equity has sustained loss and damage in the amount of $28,613.43.

43.    The money was obtained by the Debtor with knowledge of the inability to repay it.

44.    The balance of the Account was incurred without the intent to repay it.

45.    The money was obtained through false pretenses, a false representation, or actual fraud by the Defendant.

Compl. ¶¶ 36-45.

A Chapter 7 discharge does not discharge a debtor from a debt:

(2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). "To prove actual fraud under Section 523(a)(2)(A), an objecting creditor must establish five elements: (1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" *Fernandez v. Fisher* (*In re Fisher*), Adv. No. 08-05104, 2009 WL 2971581, at *3 (Bankr. E.D. Va. Sept. 11, 2009) (slip op.) (quoting *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d

13

215 (4th Cir. 2007)).  The objecting creditor has the burden of proof, and the standard of proof is

preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

Misrepresentations for the purposes of § 523(a)(2)(A) need not be overt; in the context of

§ 523(a)(2)(A), misrepresentations can be overt or may be implied by silence.

> Silence or concealment as to a material fact can constitute a false pretense or a false
> representation as surely as an overt act.  *Community Hospital of Roanoke Valley, Inc.
> v. Musser* (*In re Musser*), 24 B.R. 913, 918 (W.D. Va. 1982).  *See also Central Bank
> v. Kramer* (*In re Kramer*), 38 B.R. 80, 82 (Bankr. W.D. La. 1984); *Peterson v.
> Bozzano* (*In re Bozzano*), 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994).  As that
> phrase is used in § 523(a)(2)(A), "'false pretenses' means implied misrepresentations
> or conduct intended to create and foster a false impression."  *Bozzano*, 173 B.R. at
> 993.

*Person v. Lewis* (*In re Lewis*), Adv. No. 94-3116, 1996 WL 33676726, at *8 (Bankr. E.D. Va. Apr.

25, 1996).  In addition, "a misrepresentation of intention can constitute fraud, although mere

inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent."  *Thomas

Somerville Co. v. Slaughter* (*In re Slaughter*), Adv. No. 95-3023, 1995 WL 506827, at *2 (Bankr.

E.D. Va. July 7, 1995) (citing *Williams v. Zachary* (*In re Zachary*), 147 B.R. 881, 883 (Bankr. N.D.

Tex. 1992)).  For a breach of contract to result in a nondischargeable debt, the debtor must have

misrepresented his or her intention to perform contractual duties:

> [A] mere breach of contract does not render a debt nondischargeable under Section
> 523(a)(2)(A), even when the breach is wrongful.  For a breach of contract to result
> in a nondischargeable debt, the debtor must have misrepresented his or her intention
> to perform contractual duties, which may be inferred if the debtor failed to begin
> performance.  *Cf. FCC National Bank First Card v. Friend* (*In re Friend*), 156 B.R.
> 257 (Bankr. W.D. Mo. 1993); *Jokay Co. v. Mercado* (*In re Mercado*), 144 B.R. 879
> (Bankr. C.D. Cal. 1992); *Merchants Nat. Bank & Trust Co. of Indianapolis v.
> Pappas* (*In re Pappas*), 661 F.2d 82 (7th Cir. 1981).  In other words, there must be
> a present intention not to perform when the future performance is promised.  *Cf.
> Lawyers Title Ins. Corp. v. Pitt*, 157 B.R. 585 (E.D. Va. 1991) (continued use of false
> affidavits that were true when executed to procure draws amounted to a
> misrepresentation; "an overt misrepresentation is not a necessary predicate for
> satisfying the scienter element under § 523(a)(2)(A) when it is clear that the party

14

had no intention of performing.").

*Spinoso v. Heilman* (*In re Heilman*), 241 B.R. 137, 150 (Bankr. D. Md. 1999). Courts must also

assess whether a debtor believed he would perform his contractual obligations at the time the

contract is made.

> A debtor's subjective belief that he or she intends to perform the contract is germane
> in those cases where a debtor has *not* made an express misrepresentation of a specific
> fact that provides a basis for a claim under Section 523(a)(2)(A), but where the
> creditor nevertheless contends that Section 523(a)(2)(A) applies based on the
> debtor's alleged implied representation that the debtor intends to perform the
> contract.

*Ultra Litho, PYT, Ltd. v. Moore* (*In re Moore*), 365 B.R. 589, 605 (Bankr. D. Md. 2007), *aff'd*, No.

08-1508, 2009 WL 3359207 (4th Cir. Oct. 15, 2009) (unpublished per curiam decision). *See, e.g.*,

*Cobra Well Testers, LLC. v. Carlson* (*In re Carlson*), 381 B.R. 417, 2008 WL 193232, at *3 (B.A.P.

10th Cir. Jan. 23, 2008) (unpublished table decision) (citations omitted) ("[T]he evidence at trial

showed only a subsequent breach of contract, and a 'mere inability or failure to perform is not, in

itself, sufficient evidence of fraudulent intent [for purposes of § 523(a)(2)(A)].'"); *FIA Card Servs.

v. Flowers* (*In re Flowers*), 391 B.R. 178, 182 (M.D. Ala. 2008) (quoting *Purcell Co. v. Spriggs

Enters., Inc.*, 431 So.2d 515, 519 (Ala. 1983)) ("[The plaintiff] relies solely on [the debtor's] alleged

inability to repay his loan, even though it has been thoroughly established that the 'failure to

perform, alone, is not evidence of intent not to perform at the time the promise was made. If it were,

a mere breach of contract would be tantamount to fraud.'"); *Hall v. Jackson* (*In re Jackson*), 348

B.R. 595, 599 (Bankr. M.D. Ga. 2006) (quoting 4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed.

rev. 2006)) ("'The failure to perform a mere promise is not sufficient to make a debt

nondischargeable [under § 523(a)(2)(A)], even [if] there is no excuse for the subsequent breach.'");

*Thetford v. Levine* (*In re Levine*), 337 B.R. 840, 844 (Bankr. E.D. Va. 2005) ("The evidence makes

reasonably clear that debtor had little intent or ability to perform the contract."); *Donaldson v. Hayes* (*In re Hayes*), 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004) ("In order for a representation regarding future performance to be actionable under § 523(a)(2)(A), a debtor must lack an intent to perform when the promise was made."); *First Baptist Church v. Maurer* (*In re Maurer*), 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990) ("It is well established that a finding of fraud [under § 523(a)(2)(A)] cannot be premised upon a mere breach of contract.  Instead, to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms.").

There is no evidence here supporting the contention that Wooten and Wooten's Auto Service entered into the funding arrangement with Ocean Equity without the intent or ability to perform.[10] Ocean Equity cites as proof of an inability to perform the testimony of Wooten that the approximately $165,000.00 of capital injected into Wooten's Auto Service apparently had been largely dissipated at the time Ocean Equity provided Wooten with funding and that Wooten's Auto Service did not have sufficient income to pay Ocean Equity.  However, the evidence here shows that Wooten's Auto Service paid Ocean Equity a total of $29,286.57 between February 13, 2008, and September 19, 2008.  The evidentiary record provides no explanation of the failure of Wooten's Auto Service except a precipitous and unanticipated drop in business in the late summer of 2008,

---

[10]  Ocean Equity also contends that it learned in the Rule 2004 deposition of Wooten that Wooten and his father had invested $165,000.00 in Wooten's Auto Service, which was largely dissipated at the time of the transaction with Ocean Equity, and had it known this information, it would not have entered into the financing arrangement.  However, it does not appear that Wooten was ever asked any question relating to this nor made any representation concerning this.  It also does not appear Wooten was under any duty to disclose this information to Ocean Equity, and such omission is not supportive of the claim of nondischargeability of its debt by Ocean Equity.

contiguous with the calamitous collapse of the overall economy.  *See* Wooten Deposition, at 19, lines 17-25; 20, lines 1-4.  There is simply no support for the contention Wooten entered into the financing arrangement with Ocean Equity without the intention or ability to perform, and the Complaint to the extent it sounds under 11 U.S.C. § 523(a)(2)(A) must be dismissed.

A final contention relating to § 523(a)(2)(A) must be addressed.  While apparently raising it in the context of Ocean Equity's claim under 11 U.S.C. § 523(a)(2)(B) relating to false financial statements made in writing, Ocean Equity alleges Wooten failed to disclose to it his tax liability to the United States and had represented "he had a small state tax obligation due that was just a few thousand dollars and that there were—and that everything else at that time was current." Tr. at 9. Even if this occurred, it may not be actionable under § 523(a)(2)(A) of the Bankruptcy Code as it plainly is a statement relating to the financial condition of the debtor, which may only be actionable under 11 U.S.C. § 523(a)(2)(B) if the other provisions of that section are met.  *Blackwell v. Dabney* (*In re Blackwell*), 702 F.2d 490, 492 (4th Cir. 1983) ("All of the statements made by [the debtor] to the plaintiffs were essentially statements concerning the financial condition of [the debtor's business]. Further, all of [the debtor]'s statements were oral.  The representations are therefore outside the scope of 11 U.S.C. § 523(a)(2) and cannot be the basis for preventing discharge of the bankrupt."). *See* § II.B, *infra*, for a discussion regarding Ocean Equity's assertion that Wooten's debt to it should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(B).

### B.  11 U.S.C.  § 523(a)(2)(B): Materially False Financial Statements

Ocean Equity alleges that the financial representations contained in the Application were materially false, including but not limited to the true amount of monthly credit card receipts and total monthly income.  Compl. ¶ 49.  Section 523(a)(2)(B) of the Bankruptcy Code states:

17

(a)     A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . .

(2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B)     use of a statement in writing—

(i)     that is materially false;

(ii)     respecting the debtor's or an insider's financial condition;

(iii)     on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv)     that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

The Fourth Circuit Court of Appeals has recently addressed the requirements of 11 U.S.C. § 523(a)(2)(B), emphasizing that all five elements of that section must be proven:

In order to satisfy subsection (2)(B), a creditor must prove five elements: (1) "use of a statement in writing," (2) "that [was] materially false," (3) "respecting the debtor's . . . financial condition," (4) "on which the creditor . . . reasonably relied," and (5) "that the debtor caused to be made or published with intent to deceive."

*Columbo Bank, FSB v. Sharp* (*In re Sharp*), No. 08-1646, 2009 WL 2480841, at *1 (4th Cir. Aug. 14, 2009) (unpublished per curiam decision) (quoting 11 U.S.C. § 523(a)(2)(B)).

1.  Did Wooten Use a Written Statement Respecting His Financial Condition?

For a debt to be declared nondischargeable under Section 523(a)(2)(B), a statement regarding the financial condition of the debtor must be in writing.  In *Engler v. Van Steinburg* (*In re Van Steinburg*), 744 F.2d 1060 (4th Cir. 1984), the Fourth Circuit Court of Appeals took a broad

18

approach as to what constitutes a statement regarding financial condition. *Id.* at 1060-61. The Court points out that Congress did not speak merely in terms of "financial statements" but rather, "referred to a much broader class of statements—those 'respecting the debtor's financial condition.'" *Id.* at 1061. Therefore, the Court held that, while a statement that specific assets are unencumbered is not a "formal financial statement, such as a typical balance sheet or a profit and loss statement," such statement certainly qualifies as a statement of financial condition, since whether assets are encumbered "may be the most significant information about [the debtor's] financial condition." *Id.* at 1060-61. The financial statement here, in the form of the Application, unquestionably fulfills the requirements to constitute a statement in writing concerning the financial condition of Wooten and Wooten's Auto Service.

2. Did Wooten Make Materially False Statements in the Application?

The Court has defined a materially false statement as "'one that paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *Riggs Nat'l Bank of Washington, D.C. v. Ross* (*In re Ross*), 180 B.R. 121, 127 (Bankr. E.D. Va. 1994), *aff'd*, 199 B.R. 576 (E.D. Va. 1995) (quoting *I.H. Mississippi Valley Credit Union v. O'Connor* (*In re O'Connor*), 149 B.R. 802, 807 (Bankr. E.D. Va. 1993)). Such statements that have previously been found to constitute materially false statements include the omission of several million dollars in guaranties on a financial statement to a lending institution (*In re Ross*, 180 B.R. at 127-28); and asserting ownership of property that the debtor did not, in fact, own (*Citizens Bank of Maryland v. Broyles* (*In re Broyles*), 55 F.3d 980, 981-83 (4th Cir. 1995)).

The Court shall examine each alleged false statement made by Wooten in the Application

19

to determine whether any of the statements were materially false at the time they were made.  The

alleged false representations made by Wooten contained in the Application are as follows:

1. "Amount of credit card receipts monthly $20,000."

2. "Amount of cash receipts monthly $10,000."

3. "Do you or your business: have any judgments  No."

4. "Do [*sic*] you or your business: named in any law suits [*sic*] No."

5. "Are there any tax liens against you or your business  No."

6. "Are all taxes current  No."

Plaintiff's Exhibit 1.

In addition, while not specifically appearing in the Application, Ocean Equity asserts that

Wooten's statement to Zinner that Wooten's Auto Service had a small tax obligation and Wooten's

subsequent failure to disclose that Wooten's Auto Service owed approximately $43,000.00 in tax

obligations to the Internal Revenue Service culminate into a failure to disclose the extent of the tax

obligations of Wooten's Auto Service that also constitutes a false financial statement and fraud on

the part of Wooten.

a.  Representation of Credit Card Receipts of $20,000.00 Monthly

Ocean Equity contends Wooten misrepresented the extent of the monthly credit card receipts

of Wooten's Auto Service in the Application.  Wooten answered the question "Amount of credit

card receipts monthly" by stating the figure $20,000.00.  It appears the sole evidentiary support

offered by Ocean Equity that this statement was a misrepresentation is Wooten's deposition

testimony that the average monthly credit card sales of Wooten's Auto Service in 2008 was

$15,000.00 to $18,000.00, "sometimes higher."  Wooten Deposition, at 41, lines 21-23.  However,

Wooten in his testimony at trial stated he arrived at the amount of credit card and cash receivables represented in the Application by reviewing his profit and loss statements and averaging the monthly amounts, which he admits were estimates but states the amounts were "fairly accurate" and within $1,000.00 of the actual figures. Tr. at 46. There were no records adduced at trial by either Wooten or Ocean Equity as to what the credit card receivables of Wooten's Auto Service had actually been. At trial, Zinner admitted he would consider a representation of the monthly amount of credit card receivables to be accurate if it was within a thousand dollars. Tr. at 22. There is simply insufficient evidence in the record here that the representation as to the monthly amount of credit card receipts was false.

b. Representation of Cash Receipts of $10,000.00 Monthly

There is no evidence in the record that this representation was untrue.[11]

c. Representation of No Judgments Against Wooten or Wooten's Auto Service

There is no support in the evidentiary record that this representation was untrue. No evidence has been adduced that Wooten or Wooten's Auto Service had any judgments entered against either of them at the time the financing arrangement was entered.

d. Representation that Neither Wooten nor Wooten's Auto Service
Had Been Named in any Lawsuits

Ocean Equity contends the Notice of Intent to Levy constituted a pending lawsuit against Wooten and Wooten's Auto Service at the time of the financing, and accordingly, this answer was not truthful. There is no other evidence of a pending lawsuit against Wooten or Wooten's Auto

---

[11] Wooten testified in his deposition that the amount of monthly cash and check receipts for Wooten's Auto Service was $12,000.00 to $15,000.00 "[s]ometimes higher, sometimes lower." Wooten Deposition, at 41, lines 9-20.

Service except for the Notice of Intent to Levy relied on by Ocean Equity.  The term "lawsuit" is

undefined in the Application.  However, generally the term refers to matters pending before a court

of law:

> The word "lawsuit" does not clearly encompass arbitration claims because lawsuit
> normally means a case before a court.  *See Webster's II New Riverside University
> Dictionary* 680 (1994) (defining lawsuit as "a case brought before a court of law");
> *Black's Law Dictionary*, 799 (5th ed. 1979) (defining lawsuit as "[a] vernacular term
> for a suit, action, or cause instituted or depending between two private persons in the
> courts of law").

*Genus Credit Mgmt. Corp. v. Jones*, No. Civ. JFM-05-3028, 2006 WL 905936, at *3 (D. Md. Apr.

6, 2006).  *See also In re Legacy Health Care, LLC*, No. 05-11270, 2006 WL 2728632, at *1 (Bankr.

W.D.N.Y. Sept. 22, 2006) ("For the definition of 'lawsuit,' Black's refers the reader to 'suit,' which

word is defined as 'any proceeding by a party or parties against another in a court of law.'"); *In re

Leonard*, 12 B.R. 91, 92 (Bankr. D. Md. 1981) ("'Lawsuit' is defined in Black's Law Dictionary,

citing *Sheperd v. Standard Motor Co.*, 263 Ky. 329, 92 S.W.2d 337 (1936), as 'a vernacular term

for a suit, action, or cause instituted or depending between two private persons in the courts of

law.'").  While hardly a harbinger of good things to come for the business, nonetheless the Notice

of Intent to Levy of the Internal Revenue Service is not a pending lawsuit, and this representation

by Wooten in the Application is not proven to be false.

### e.  Representation of No Tax Liens

Similar to the alleged "lawsuit" misrepresentation, addressed above, Ocean Equity contends

the Notice of Intent to Levy constitutes a tax lien pending at the time the financing arrangement was

made, rendering Wooten's representation that no tax liens existed against either himself or Wooten's

Auto Service untrue.  Here again, by its very terms, the Notice of Intent to Levy apprises of the

possible future intention of the Internal Revenue Service to effect a tax lien.[12] As there is no other

evidence of a pending tax lien at the time the financing arrangement was made, it appears the

representation of Wooten that there existed no pending tax liens was not a misrepresentation.[13]

### f.  Representation of Taxes Not Being Current

Ocean Equity contends Wooten misrepresented the payment status of his taxes at the time

of the financing arrangement.  However, the question posed in the Application to Wooten was "[a]re

all taxes current," to which Wooten answered "No."  This appears to have been answered truthfully,

as the evidence shows Wooten's Auto Service was not current on its taxes owed to the United States

at the time of the Application.  Stipulation of Fact ¶ 7.  The inquiry does not end there, however, as

Ocean Equity alleges that upon inquiry by Zinner, Wooten told Zinner that "he had a small state tax

obligation due that was just a few thousand dollars and that there were—and that everything else at

that time was current," and Wooten failed to advise Zinner that Wooten's Auto Service owed in

excess of $43,000.00 to the Internal Revenue Service.  Tr. at 9-10.  Problematic, however, is that

this statement of Wooten did not appear in writing on the Application but rather was made orally

by Wooten to Zinner.

The Fourth Circuit Court of Appeals has long concluded that a false statement relating to the

financial condition of a debtor must be in writing in order for a debtor's discharge to be denied under

---

[12]  The Notice of Intent to Levy provides in this regard: "We *may* file a Notice of Federal Tax Lien at any time to protect the government's interest."  Plaintiff's Exhibit 7 (emphasis added).

[13]  Evidence was admitted regarding a lien asserted by the Commonwealth of Virginia for delinquent employer taxes, but a review of the relevant exhibit reveals that this lien was not asserted until March 3, 2008, after the completion of the Application on January 30, 2008. Plaintiff's Exhibit 5.

§ 523(a)(2)(B) of the Bankruptcy Code:

> We find it unnecessary to reach the question of whether [the debtor]'s statements constituted false representations or puffing because the relevant statutory provision excepts oral statements concerning the debtor's or an insider's financial condition.

> . . . .

> All of the statements made by [the debtor] to the plaintiffs were essentially statements concerning the financial condition of [the debtor's business]. Further, all of [the debtor]'s statements were oral. The representations are therefore outside the scope of 11 U.S.C. § 523(a)(2) and can not be the basis for preventing discharge of the bankrupt. *In re Patch*, 22 B.R. 970 (Bankr. D. Md. 1982); *In re Bedard*, *supra*; *In re Kiernan*, 17 B.R. 362 (Bankr. S.D.N.Y. 1982); 1 Norton *Bankruptcy Law and Practice*, § 27-40, § 27.42 (1981).

*Blackwell v. Dabney* (*In re Blackwell*), 702 F.2d 490, 492 (4th Cir. 1983).

This conclusion was recently reaffirmed in *Columbo Bank v. Sharp* (*In re Sharp*), No. 08-1646, 2009 WL 2480841 (4th Cir. Aug. 14, 2009) (unpublished per curiam decision):

> Significantly, subsection (2)(A) does not apply if the disputed statement is "respecting the debtor's . . . financial condition." § 523(a)(2)(A); *see also Blackwell v. Dabney* (*In re Blackwell*), 702 F.2d 490, 491 (4th Cir. 1983) (discussing scope of phrase "respecting the debtor's . . . financial condition"). Subsection (2)(B), on the other hand, was designed to bar the bankruptcy discharge of a debt obligation that was induced by a false written statement of the debtor's financial condition. *See Field*, 516 U.S. at 66. In order to satisfy subsection (2)(B), a creditor must prove five elements: (1) "use of a statement in writing," (2) "that [was] materially false," (3) "respecting the debtor's . . . financial condition," (4) "on which the creditor . . . reasonably relied," and (5) "that the debtor caused to be made or published with intent to deceive." § 523(a)(2)(B).

*Id.* at *1. Here the omission of Wooten related to the financial condition of Wooten's Auto Service, specifically to the unpaid tax obligations of the business, and in order to be actionable under 11 U.S.C. § 523(a)(2)(B) must have been in writing, which it was not.[14] Therefore, the Court finds that

---

[14] It is certain the failure by Wooten to disclose the amounts owed to the Internal Revenue Service is reprehensible but in order to obtain a declaration of nondischargeability of a

there is no actionable misrepresentation by Wooten in the Application, and the count under 11

U.S.C. § 523(a)(2)(B) fails.[15]

### C.  11 U.S.C. § 523(a)(6): Willful and Malicious Injury

Ocean Equity contends the indebtedness owed to it by Wooten is not dischargeable because

Wooten liquidated collateral pledged to secure repayment of the obligation to Ocean Equity and did

not pay over to it any of the proceeds.  Ocean Equity's allegations in this regard are found in

paragraphs 56 through 60 of the Complaint:

> 56.    The Debtor testified that he sold or transferred all of the assets on which Ocean Equity had a lien, and did not pay the money to Ocean Equity.
>
> 57.    Upon information and belief, the Debtor removed all of said assets from the business location "in the middle of the night," and the status of said assets are unknown.
>
> 58.    In either case, the Debtor converted the assets on which Ocean Equity had a security interest.
>
> 59.    The Debtor's actions were intentional and were intended to cause injury to Ocean Equity.
>
> 60.    The Debtor's actions caused a wilful [*sic*] and malicious injury to Ocean Equity.

Compl. ¶¶ 56-60.

Section 523(a)(6) of the Bankruptcy Code provides that a debtor will not receive a discharge

---

debt pursuant to § 523, the necessary elements of the statute must be proven.  *See In re Sharp*, 2009 WL 2480841, at *5 ("Although [the debtor's] behavior was entirely reprehensible, such behavior does not—in the absence of sufficient proof of the reliance elements—render his debt obligations on the Loan nondischargeable under either subsection (2)(A) or (2)(B).").

[15]  Because the Court has determined the statements in the Application by Wooten did not constitute misrepresentations for the purposes of 11 U.S.C. § 523(a)(2)(B), the remainder of the elements required to be proven are not examined here.

of any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To obtain a determination of nondischargeability under § 523(a)(6), a creditor must ultimately prove three elements: "(1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) that the debtor's actions were malicious." *E.L. Hamm & Assocs., Inc. v. Sparrow* (*In re Sparrow*), 306 B.R. 812, 834 (Bankr. E.D. Va. 2003) (citing *Glucona Am. Inc. v. Ardisson* (*In re Ardisson*), 272 B.R. 346, 356 (Bankr. N.D. Ill. 2001)).

The United States Supreme Court dramatically changed the landscape of § 523(a)(6) nondischargeability proceedings in its decision of *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).[16] In *Geiger*, the Supreme Court concluded the language of § 523(a)(6) encompassed only acts done with the actual intent to cause injury and not merely intentional acts that happen to cause injury:

---

[16] As this Court has previously stated:

Prior to *Geiger*, § 523(a)(6) encompassed a broad range of conduct. In *Branch Banking & Trust Co. of Va., Inc. v. Powers* (*In re Powers*), 227 B.R. 73 (Bankr. E.D. Va. 1998), this Court explained the prior case law:

> Courts focused on both the malice prong and the willful prong of § 523(a)(6). The word "willful" was defined as "a deliberate or intentional act which necessarily leads to injury." In proving intent prior to *Geiger*, the creditor was only required to show the debtor's act was intentional; there was no requirement to show that the injury was intended. When an act, such as conversion, was done intentionally and produced harm without just cause or excuse, it was willful and malicious for purposes of § 523(a)(6), without proof of a specific intent to injure. Intent to injure was established by showing that the debtor intentionally performed an act which necessarily caused injury or that was certain to ca[u]se injury.

*Id*. at 74 (citations omitted). Thus, a debtor could not discharge under § 523(a)(6) any intentional act, which necessarily caused an injury, even if the debtor never intended the resulting injury.

*In re Sparrow*, 306 B.R. at 834-35.

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.*, "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

*Id.* at 61-62 (citing Restatement (Second) of Torts § 8A cmt. a (1964)). Immediately after *Geiger*, courts considered different approaches as to the proper application of *Geiger* to adjudication of these disputes. *In re Sparrow*, 306 B.R. at 838 ("Thus, we are confronted by a difference of interpretation between the various circuits in the aftermath of *Geiger*, with the critical distinction as to whether finding that a debtor was substantially certain that harm would occur is measured by a wholly subjective standard or an objective determination."). Judge Huennekens has more recently considered this question and has written:

Since the *Geiger* decision, courts have struggled to determine whether a debtor must have specifically intended the injury or whether the commission of an intentional tort that is "substantially certain to result in injury" is sufficient to satisfy the willfulness requirement. *Johnson v. Davis* (*In re Davis*), 262 B.R. 663, 670 (Bankr. E.D. Va. 2001). This Court has previously adopted the "objective substantial certainty" or "subjective motive" test to satisfy the willfulness requirement. *In re Trammell*, 388 B.R. 182, 187 (Bankr. E.D. Va. 2008) (citing *Parsons v. Parks* (*In re Parks*), No. 03-1072, 2003 WL 22989684, at *1 (4th Cir. Dec. 19, 2003) ("[t]he test, then, is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.'")).

*Singh v. Sohail* (*In re Sohail*), Adv. No. 08-03059-KRH, 2009 WL 1851247, at *7 (Bankr. E.D. Va. June 25, 2009).[17]

---

[17] Judge Huennekens has elaborated on this analysis in *In re Trammell*:

Since the *Geiger* decision, courts have struggled to determine whether a debtor must

27

Despite the concerns since *Geiger*, the malice prong of § 523(a)(6) appears unchanged. As

Chief Judge Tice of this Court has written:

> Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *See In re Stanley*, 66 F.3d at 667 (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008-09 (4th Cir. 1985)). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. *See In re Powers*, 227 B.R. at 73.

> Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. *See St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under . . . § 523(a)(6)."); *Hagan v. McNallen* (*In re McNallen*), 62 F.3d 619, 625 (4th Cir. 1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley*, 66 F.3d at 667.

---

have specifically intended the injury or whether the commission of an intentional tort that is "substantially certain to result in injury" is sufficient to satisfy the willfulness requirement. *Johnson v. Davis* (*In re Davis*), 262 B.R. 663, 670 (Bankr. E.D. Va. 2001) (quoting *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 603 (5th Cir. 1998)); *see also Miller*, 156 F.3d at 603 (stating that the Supreme Court had left three possible "readings" to a finding of willfulness under § 523(a)(6): "The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury" and holding that "either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful . . . injury' in § 523(a)(6)"); *Stone St. Capital, Inc. v. Granati* (*In re Granati*), 270 B.R. 575, 591 (Bankr. E.D. Va. 2001), *aff'd*, 307 B.R. 827 (E.D. Va. 2002), *aff'd*, 63 Fed. Appx. 741 (4th Cir. 2003) (citing *Johnson*, 262 B.R. at 670). The Court of Appeals for the Fourth Circuit appears to have adopted the "objective substantial certainty" or "subjective motive" test to satisfy the willfulness requirement. *Parsons v. Parks* (*In re Parks*), No. 03-1072, 2003 WL 22989684, at *1 (4th Cir. Dec. 19, 2003) ("[t]he test, then, is whether the debtor acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.'") (quoting *Miller*, 156 F.3d at 603).

*Haas v. Trammell* (*In re Trammell*), 388 B.R. 182, 186-87 (Bankr. E.D. Va. 2008).

*Johnson v. Davis* (*In re Davis*), 262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001).

Application of these principles to alleged instances of conversion requires careful consideration after *Geiger*. As Judge Whitley has reminded us:

> A simple breach of contract . . . , even if intentional, would not give rise to a §
> 523(a)(6) violation. *Strum v. Exxon Co.*, 15 F.3d 327, 327 (4th Cir. 1994). For the
> debt to be nondischargeable under § 523(a)(6), the breach must be accompanied by
> some conduct that is legally wrongful or tortuous within the meaning of § 523(a)(6).
> *Id.* One such independent, but intentional, act is willful conversion.

*Hasalia v. Walker* (*In re Walker*), 419 B.R. 449, 468 (Bankr. W.D.N.C. 2009).

Conversion can constitute a willful and malicious injury to property for the purpose of §

523(a)(6). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 331-32 (1934) (decided under former

Bankruptcy Act of 1898); *Harmon v. Scott* (*In re Scott*), 203 B.R. 590, 598 (Bankr. E.D. Va. 1996);

*Richmond Metro. Hosp. v. Hazelwood* (*In re Hazelwood*), 43 B.R. 208, 213 (Bankr. E.D. Va. 1984).

As the Supreme Court has cautioned, however:

> [A] willful and malicious injury does not follow as of course from every act of
> conversion, without reference to the circumstances. There may be a conversion
> which is innocent or technical, an unauthorized assumption of dominion without
> willfulness or malice. There may be an honest but mistaken belief, engendered by
> a course of dealing, that powers have been enlarged or incapacities removed. In
> these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis*, 293 U.S. at 332 (internal citations omitted). In *Davis*, a secured lender argued that the sale

of collateral by the debtor without the consent required by loan documents constituted a willful and

malicious injury to the lender's property, creating a nondischargeable obligation. *Id.* at 330.

However, the Court held that past course of dealing between the parties involved many occasions

in which the debtor sold the lender's collateral upon similar terms and without the lender's express

consent; as a result, malice had not been shown. *Id.* at 332. Notwithstanding all of this, a case-by-

case analysis remains essential in assessing conversion:

29

Though the standard in these cases may have changed, it remains clear that each case must be determined on its unique facts. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Endicott*, 254 B.R. 471 (Bankr. D. Idaho 2000). "[T]he key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is the result of a negligent or reckless tort-but not wilful and malicious." *In re Kidd*, *supra*, 219 B.R. at 284.

*Lincoln Land FS, Inc. v. Bennett* (*In re Bennett*), 293 B.R. 760, 763 (Bankr. C.D. Ill. 2003).

Judge Morgan has recently discussed the requirements for a finding of conversion in Virginia:

In the Commonwealth of Virginia, conversion is "the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 259 Va. 806, 814, 528 S.E.2d 714, 719 (2000). A plaintiff alleging conversion must have a property interest in the converted property and be entitled to immediate possession of that property. *Id.* A debtor's intent would not be relevant in a tort action for conversion in Virginia. *See, e.g.*, *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 301-02, 505 S.E.2d 196, 201 (1998) ("Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights.").

*Kubota Tractor Corp. v. Strack*, Civil No. 4:06cv145, 2007 WL 517492, at *5 (E.D. Va. Feb. 6, 2007), *rev'd on other grounds*, *In re Strack*, 524 F.3d 493 (4th Cir. 2008).

Prior to *Geiger*, the Fourth Circuit Court of Appeals had little trouble concluding a debtor who misappropriated or converted another's property would not receive a discharge of the obligation under § 523(a)(6) of the Bankruptcy Code. *See, e.g.*, *First Nat'l Bank of Md. v. Stanley* (*In re Stanley*), 66 F.3d 664, 668 (4th Cir. 1995) (holding that debtor who used monies drawn from a line of credit mistakenly increased by a bank was guilty of conversion, and such actions excepted the debt from discharge as willful and malicious injury); *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009-10 (4th Cir. 1985) (holding that a debtor's action in using the proceeds of a government check to buy luxury items, after he had agreed with an insurer to place the check in an

30

account for disbursal to the insurer, amounted to willful and malicious injury); *see also Pollock v. Gandara* (*In re Gandara*), 218 B.R. 808, 811-13 (Bankr. E.D. Va. 1997) (holding that a patient who assigned to a health care provider an interest in settlement proceeds of a personal injury action and then utilized the proceeds without honoring the assignment committed willful and malicious injury); *Harmon v. Scott* (*In re Scott*), 203 B.R. 590, 598-99 (Bankr. E.D. Va. 1996) (finding that debtor's retention of unearned monies remaining from six-month advance of wages and spending monies after demand for their return constituted willful and malicious injury); *Bodie v. Britt* (*In re Britt*), 156 B.R. 511, 519 (Bankr. E.D. Va. 1993) (holding that a real estate agent who withdrew escrow funds and paid them to himself committed conversion that was nondischargeable under § 523(a)(6)).

Cases subsequent to *Geiger* that have considered whether acts of conversion constitute willful and malicious injury focus on the distinction between whether the conversion was an intentional one or merely a reckless or negligent conversion of property. *Compare Peklar v. Ikerd* (*In re Peklar*), 260 F.3d 1035, 1039 (9th Cir. 2001) (finding an indebtedness dischargeable where "[the debtor's] conversion of [the creditor's] property was at worst negligent, and at best 'innocent or technical,' conversion."), *and Via Christi Reg'l Med. Ctr. v. Budig* (*In re Budig*), 240 B.R. 397, 401 (D. Kan. 1999) (holding that debtor's alleged conversion of insurance benefits assigned to medical center could not constitute willful and malicious injury "[b]ecause the debtors did not know the money belonged to Via Christi [medical center], [and thus] they could not have had the necessary intent to cause willful injury."), *with LaBrecque v. Armada Mfg. Co.*, No. 5:98-CV-824, 1999 WL 1939980, at *2 (E.D.N.C. May 3, 1999) ("This conclusion is appropriate because [the debtor] intentionally sold the boat and kept the proceeds without [the creditor]'s approval while knowing that the boat (and its proceeds) belonged to [the creditor]. Such a conversion qualifies as

31

willful and malicious for purposes of § 523(a)(6)."), *and Call Fed. Credit Union v. Sweeney* (*In re Sweeney*), 264 B.R. 866, 872 (Bankr. W.D. Ky. 2001) (finding a debtor who cashed a two party check representing insurance proceeds intended to harm credit union when he converted the monies to his own use).   The discerning of a debtor's intent in the context of a conversion case is particularly difficult:

> The problem with conversion cases . . . is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result from a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is the result of a negligent or reckless tort—but not willful or malicious.

*Avco Fin. Servs. of Billings v. Kidd* (*In re Kidd*), 219 B.R. 278, 284 (Bankr. D. Mont. 1998).   The distinction necessitates consideration of where a debtor's conduct falls within the broad continuum of what may constitute acts of conversion:

> The common law tort of conversion does not fall neatly into either of Justice Ginsberg's categories because the conduct it reaches spans both.   At common law, a defendant who is shown to have exercised dominion over a plaintiff's property is liable for the resulting conversion, even where she reasonably and innocently believes the property is her own.   At the other end of the spectrum, common law conversions encompasses torts, like embezzlement, that are also prosecutable as crimes.

*Haemonetics Corp. v. Dupre*, 238 B.R. 224, 230 (D. Mass. 1999), *aff'd*, 229 F.3d 1133 (1st Cir. 2000) (unpublished table decision) (internal citations omitted).

Conversion cases also require careful consideration of the nature of the injury suffered by the creditor when a court considers whether a debtor "intended" to cause the specific harm inflicted. As one court has observed:

> The creditor's true injury occurs on an abstract level.   It is the debtor's invasion of the creditor's legally protected right.   The court should focus on this injury, as

opposed to the resulting damage, when it asks whether the injury was intentional. When it does so, the answer will usually be relatively obvious because the debtor's action *is* the injury. For example, in a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor. In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that led to the damaged reputation. Consequently, the proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks. Similarly, in the conversion of collateral scenario, the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. Consequently, the proper question is not whether the debtor intended that its secured creditor would go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.

*ABF, Inc. v. Russell* (*In re Russell*), 262 B.R. 449, 454-55 (Bankr. N.D. Ind. 2001) (internal citation omitted). *See also Dominion Virginia Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 335-36 (Bankr. E.D. Va. 2006); *Ferraro v. Ballard* (*In re Ballard*), Adv. No. 00-07041-S, 2001 WL 1946239, at *11-13 (Bankr. E.D. Va. July 17, 2001).

The determination here turns on the question of whether the conversion of the collateral of Ocean Equity was "malicious." It is undisputed Wooten liquidated the equipment of Wooten's Auto Service at the time of or subsequent to the closure of the business. It is further evident that the Agreement conveyed a security interest in the assets of Wooten's Auto Service to Ocean Equity to secure its financing to Wooten's Auto Service.[18] Zinner testified that Ocean Equity perfected its

_____

[18] Paragraph D.1.b. of the Agreement provides Ocean Equity with "a continuing first party lien, security interest and assignment (Security Interest) in . . . accounts, instruments, inventory, equipment, general intangibles, chattel paper, cash and cash equivalents, documents, deposit and other accounts . . . ." Paragraph D.1.c. of the Agreement additionally provides Ocean Equity with a lien and security interest in "[a]ny and all fixtures an [*sic*] Personal Property

security interest in the assets of Wooten's Auto Service, including its equipment, although no financing statements were introduced into evidence.[19]  It is also undisputed that the proceeds of this equipment liquidation were not paid over to Ocean Equity after sale of the equipment by Wooten, who paid over a portion of the proceeds to himself, which was used to pay the mortgage on his personal residence, and paid the remainder to his employees in payment of their salaries.

Wooten argues he did not liquidate the equipment of Wooten's Auto Service with any malicious intent to injure the interests of Ocean Equity.  Wooten asserts he did not read the Agreement at the time of its execution and contends he was unaware of Ocean Equity's lien on the equipment, believing the only security for the financing to be Ocean Equity's purchase of his credit card receivables.  Decisions involving similar claims of conversion of collateral subject to a security interest illustrate that consideration of the exigent circumstances is necessary to conclude whether a debtor acted maliciously in converting property subject to a lien.  In *Bancfirst v. Padgett* (*In re Padgett*), 105 B.R. 665 (Bankr. E.D. Okla. 1989), a malicious conversion was found where the president of a car sales business failed to remit the proceeds of sales to the lender to the business:

> Further, "malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights.  *In re Nelson*, 67 B.R. at 497; *In re Dever*, 49 B.R.

---

affixed to or situated on the Seller's [Wooten's] premises."  Plaintiff's Exhibit 2.

   [19]  It does not appear that the conversion claim of Ocean Equity would be adversely affected had the security interest not have been perfected.  *See Dominion Nat'l Bank of Richmond v. Gantt* (*In re Gantt*), 56 B.R. 852, 856-57 (Bankr. E.D. Va. 1985) (citing *In re Sindic*, 44 B.R. 167, 172 (Bankr. E.D. Wis. 1984); *In re Cardillo*, 39 B.R. 548 (Bankr. D. Mass. 1984)) ("While failure to perfect may render a lien subordinate to the rights of third parties, as between a debtor and a creditor, the security interest is binding and a debtor is barred from denying its validity. . . . In other words, the existence of a security agreement between the debtor and a creditor, although invalid as against third parties, gives rise to a property right which can be converted.").

329, 332 (Bankr. W.D. Ky. 1984).  Such knowledge can be inferred from the debtor's experience in the business, his concealment of the sale, or by his admission that he has read and understood the security agreement.  *In re Cullen*, 71 B.R. 274, 282 (Bankr. W.D. Wisc. 1987); *In re Gantt*, 56 B.R. 852, 857 (Bankr. E.D. Va. 1985); *United Bank of Southgate v. Nelson*, 35 B.R. 766, 776 (Bankr. N.D. Ill. 1983)."  *In re Posta*, *supra* at p. 367-68.

. . . An examination of the resulting injury from the conduct of the debtor must be found.  By failing to remit the proceeds in conformity with the Security Agreement, the Plaintiff clearly sustained an economic injury resulting from the Debtor's behavior.  In addition, the evidence bears out a conclusion that the Debtor is a sophisticated businessman, having been in the business of selling automobiles for sometime.  The Debtor admits that he read and understood his obligations under the Security Agreement with the Plaintiff and yet did not remit the proceeds from the sale of the subject vehicles to the Plaintiff as required.  Further, some evidence was presented to this Court indicating that the Debtor concealed the sale of a portion of the vehicles upon inquiry from the Plaintiff.  As a result of these findings and conclusions, we find that the actions of the Debtor were indeed "malicious" as required by the Bankruptcy Code.

*Id*. at 667-68.  Other decisions have found the circumstantial evidence in question as mitigating a conclusion that a debtor acted maliciously in effecting a conversion of collateral.  *See, e.g.*, *Commercial Bank v. Breedlove* (*In re Breedlove*), Adv. No. 04-1116, 2007 WL 2034143 at *20 (Bankr. N.D. Okla. July 9, 2007) ("Circumstantial evidence supports that [the debtor] intended to pay the Bank for the 'out of trust' vehicles either with future profits or when he sold the dealership. . . . Notably, once it became apparent that [the debtor's business] could not continue as a going concern, [the debtor] did not sell or otherwise compromise the Bank's collateral.").

An examination of all the circumstances in evidence here convinces the Court that Wooten did liquidate the equipment of Wooten's Auto Service willfully and maliciously to deprive Ocean Equity of the proceeds of this liquidation contrary to the lien of Ocean Equity.  Wooten contends he did not read the Agreement and was unaware Ocean Equity had any collateral for its financing except the credit card receipts.  More credible is the testimony of Zinner that he discussed the extent

of the liens granted by the Agreement with Wooten at the time of the Agreement's execution.

Wooten was not an inexperienced businessman at the time of the transaction, and it is undisputed

that he initialed every page of the Agreement, including the page containing the grant of the security

interest to Ocean Equity on all of the assets of Wooten's Auto Service, including its equipment.  At

the time of the liquidation of the equipment, Wooten's Auto Service had ceased doing business, and

Wooten could not have had any expectation that the business operations of Wooten's Auto Service

would pay any monies to Ocean Equity, thereby ensuring that the liquidation of the equipment

would injure Ocean Equity.  Wooten did not use any of the proceeds of the equipment liquidation

to finance the operation of the business or even to pay any creditors of the business, except for salary

owed to his employees.  A substantial portion of the proceeds was used by Wooten to make

payments on the mortgage on his personal residence.  Wooten failed to notify Ocean Equity of the

closure of its business notwithstanding the fact Wooten knew Wooten's Auto Service still owed

money to Ocean Equity and that this cessation of business would terminate the only regular source

of payment of the debt to Ocean Equity, that being the credit card receipts.  The Court does not find

credible Wooten's statement that had he known Ocean Equity had a lien on all of the equipment of

Wooten's Auto Service, he would have surrendered the equipment to it, particularly in light of

Wooten's testimony that a significant portion of the liquidation proceeds was used to pay the

mortgage on his personal residence.  As a result, all of these circumstances indicate Wooten's

conversion of the equipment pledged as collateral to Ocean Equity was not an innocent, negligent,

or reckless conversion, but rather was done willfully and maliciously and intended to deprive Ocean

Equity of the benefit of its equipment collateral when Wooten's Auto Service failed.

D.  Measure of Damages

The remaining issue before the Court is the extent of damages to be awarded to Ocean Equity. Ocean Equity argues the entire unpaid indebtedness of Wooten's Auto Service and Wooten to Ocean Equity should be found to be nondischargeable. However, as Judge Waites has instructed the better determination is to look to the fair market value of the disposed of collateral at the time of conversion:

> In determining damages for willful and malicious injury to personal property subject to a perfected security interest, courts have used different criteria in determining the amount of the nondischargeable obligation. Some courts hold the outstanding balance of the loan to be nondischargeable. *See, e.g.*, *In re Moore*, 136 B.R. at 573 (citing *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir. 1988)); *see also National City Bank v. Imbody* (*In re Imbody*), 104 B.R. 830, 838-39 (Bankr. N.D. Ohio 1989). On the other hand, other courts have granted creditors nondischargeable judgments for the fair market value of the collateral at the time of the conversion. *See, e.g.*, *Friendly Finance Serv. Mid-City, Inc. v. Modicue* (*In re Modicue*), 926 F.2d 452 (5th Cir. 1991) (concluding that the fair market value of boat at the time of conversion was nondischargeable); *Fidelity Financial Servs. v. Cox* (*In re Cox*), 243 B.R. 713, 720 (Bankr. N.D. Ill. 2000); *Sears, Roebuck & Co. v. Dibben* (*In re Dibben*), 139 B.R. 23, 24 (Bankr. D. Idaho 1992) (citing *In re Penney*, 76 B.R. 160, 162 (Bankr. N.D. Cal. 1987)) ("When a debt is declared nondischargeable, the amount of the nondischargeable debt is determined by the fair market value of the collateral at the time of conversion.").

> As the court in *In re Modicue* noted, "the appropriate measure for non-dischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis." *Id.* at 453. In this case, the Court finds that the fair market value of the collateral at the time of the conversion is the appropriate award of nondischargeable damages. Based on the testimony offered by Mr. Parrish at the hearing, the Court finds that the fair market value of the collateral at the time of the conversion was $60,000.00. However, [the creditor] has incurred $10,606.95 in repair costs to restore the collateral so that it could be offered for sale. In order to prevent [the creditor] from receiving a windfall, the Court holds that the damage award in the amount of $60,000 should be reduced by any amount that [the creditor] realizes from the sale of the mobile home, less the cost expended to restore it.

*Oakwood Acceptance Corp. v. Coltrane* (*In re Coltrane*), 273 B.R. 478, 480 (Bankr. D.S.C. 2001).

(footnote omitted). *Accord*, *Commerce Title Co. v. Olson*, No. 97 C 3950, 1998 WL 88892, at *2

(N.D. Ill. Feb. 12, 1998) (citing *Friendly Fin. Serv. Mid-City, Inc. v. Modicue* (*In re Modicue*), 926 F.2d 452, 453 (5th Cir. 1991)) ("The debt is not the underlying contract—here a promissory note—but 'an amount equal to the injury caused by the debtor.'"); *The Magic Lamp, L.L.C. v. LeBlanc* (*In re LeBlanc*), 346 B.R. 706, 714 (Bankr. M.D. La. 2006); *see also Mazi v. Gilley*, 44 Va. Cir. 322, 1998 WL 972080, at *3 (Va. Cir. Jan. 22, 1998) (citing *Straley v. Fisher*, 176 Va. 163, 10 S.E.2d 551 (1940)) ("In an action for conversion, when the conversion is complete, the measure of damages, as a general rule, is the value of the property converted at the time and place of the conversion.").

Here the sole evidence of the fair market value of the equipment of Wooten's Auto Service liquidated by Wooten is the amount obtained by him upon the sale of the equipment at the time of closure of the business. *See supra*, at 11-12, fn. 9. Each sale was to unrelated third parties, and the sales price from each respective sale is the only evidence in this record of the fair market value of the liquidated equipment at the time of its conversion.[20] Thus, the Court finds the fair market value of the equipment converted by Wooten to be Ten Thousand Nine Hundred Fifty Dollars ($10,950.00), and this amount owing to Ocean Equity by Wooten should not be discharged. A separate order to this effect will be entered by the Court.

### E. Attorney's Fees

Ocean Equity seeks an award of attorney's fees, contending they are entitled to such an award under the terms and conditions of the Agreement, and that it has incurred $8,500.00 in fees

---

[20] There is evidence in the record of the original purchase price of some of the equipment, but the lack of temporal proximity of the purchase to the time of conversion and the unknown condition of the equipment at the time of closure of Wooten's Auto Service make this evidence not probative of the fair market value of the converted equipment.

up to the date of trial.  *See* Tr. at 17-18.  However, the sole basis found here to award monies to Ocean Equity that may not be discharged lies not under the provisions of the Agreement but instead flows from the conclusion Wooten willfully and maliciously committed the intentional tort of conversion.  Also problematic is the requirement of the Agreement that an award of attorney's fees be "reasonable," and no proof of the reasonableness of the attorney's fees was presented at trial.[21]

In Virginia, generally an award of attorney's fees must be supported by statute or contract. As this Court earlier concluded:

> The Commonwealth of Virginia follows the American Rule, and as in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), "in the absence of a statute or contract to the contrary, a [Virginia] court may not award attorney's fees to the prevailing party." *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 300 (Va. 1999).

*Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 100 (Bankr. E.D. Va. 2005).

There is no contention here any award of attorney fees is supported by any statutory provision, and, for the reasons outlined above, the contractual basis of support asserted here is wanting.  There are limited exceptions to the necessity of a contractual or statutory foundation for an award of attorney fees under Virginia law, the principal one of which relates to fraud actions:

> [T]he Supreme Court of Virginia recognized an exception to the general rule in Virginia against awarding attorneys' fees except when provided for by statute or contract, upholding a chancellor's award of incurred attorneys' fees to plaintiffs prevailing on claims of fraud and constructive fraud.  *Bershader*, 515 S.E.2d at 300-01.

---

[21]  Paragraph I.7. on page 7 of the Agreement provides: "The Seller [Wooten] shall be liable for all of the Purchaser's [Ocean Equity's] costs of the suit, including reasonable attorney fees."

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 359 F. Supp. 2d 497, 501 (E.D. Va. 2005).[22]  However,

as Judge Ellis recognized, this exception is narrow:

> Although it is clear from *Bershader* that the avoidance of a hollow victory is the purpose underlying the holding of the case, neither that decision nor its progeny establishes clear boundaries for the fraud exception to the general rule against awarding attorneys' fees unless authorized by statute or contract.  Consequently, although *Bershader* itself involved only a chancellor's discretion to award fees "in a fraud case," C.F. Trust argues that *Tauber v. Commonwealth*, a *Bershader* descendant, authorizes fee awards beyond the confines of *Bershader.*  This argument is unpersuasive; *Tauber*, strictly speaking, merely upheld the denial of fees in a case involving claims of conversion, usurpation of corporate opportunities, and self-dealing.  *See Tauber*, 562 S.E.2d at 132-33.  Any suggestion in *Tauber* that *Bershader* is applicable outside the realm of common-law fraud is pure dictum.  Further, no court has awarded fees under *Bershader* except in cases involving claims of actual and constructive fraud.  In sum, therefore, the most that can fairly be said regarding *Bershader* and its progeny are (i) that Virginia law permits a chancellor to award attorneys' fees to a party prevailing on claims of common-law fraud, and (ii) that this exception, like all exceptions to the rule against awarding attorneys' fees unless authorized by statute or contract, should be interpreted narrowly.  *See Commonwealth v. Appomattox County Bd. of Supervisors*, 59 Va. Cir. 341, 347 (2002) ("the Virginia Supreme Court has shown reluctance to expand the scope of the[ ] exceptions [to the general rule]").  Accordingly, while neither *Bershader* nor its progeny are clear as to the boundaries of the fraud exception, it is unlikely that *Bershader* would allow an award of attorneys' fees in the instant case, a case involving novel and unresolved issues of Virginia corporations law rather than classic fraud.

*Id.* at 502-03.  As this Court has not founded its award against Wooten based upon fraud, and in the

absence of a statutory or proven contractual basis to award attorney's fees, an award of attorney's

fees to Ocean  Equity under Virginia law is not warranted.  Accordingly, the prayer for attorney's

fees should be denied.

A separate Order will issue consistent with the findings contained in this Memorandum

---

[22]  For a review of the other limited circumstances in which a Virginia court has permitted an award of attorney's fees in the absence of a contractual or stautory basis, see *In re Bowden*, 326 B.R. at 100-01.

Opinion.

The Clerk is ORDERED to transmit a copy of this Memorandum Opinion to Steven L.

Brown, counsel for Ocean Equity Group, Inc.; to John E. Bedi, counsel for Justin N. Wooten; and

to Debera F. Conlon, Assistant United States Trustee.

**Entered this 5th day of January, 2010, at Norfolk, in the Eastern District of Virginia.**

Stephen C. St. John
United States Bankruptcy Judge